[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. M/I Homes of Cincinnati, L.L.C. v. Clermont Cty. Bd. of Elections*, Slip Opinion No. 2025-Ohio-4362.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION No. 2025-OHIO-4362

THE STATE EX REL. M/I HOMES OF CINCINNATI, L.L.C. *v*. CLERMONT COUNTY BOARD OF ELECTIONS.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. M/I Homes of Cincinnati, L.L.C. v. Clermont Cty. Bd. of Elections*, Slip Opinion No. 2025-Ohio-4362.]

*Prohibition—Mandamus—Elections—R.C. 519.12—Referendum petition's brief summary of proposed zoning amendment was sufficient because it accurately described present zoning status of the affected land parcels, nature of the requested zoning change, and the affected acreage— Referendum petition's brief summary was not required to enumerate series of features associated with proposed residential development on affected parcels if zoning amendment were enacted—Map accompanying referendum petition was appropriate and suitable because it would not mislead average person about the area affected by proposed zoning amendment—Writs denied.*

(No. 2025-1088—Submitted September 10, 2025—Decided September 17, 2025.)

IN PROHIBITION and MANDAMUS.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER, DEWINE, BRUNNER, DETERS, HAWKINS, and SHANAHAN, JJ.

**Per Curiam.**

{¶ 1} In this expedited election case, relator, M/I Homes of Cincinnati, L.L.C., requests a writ of prohibition to prohibit respondent, the Clermont County Board of Elections, from placing a zoning-amendment referendum on the November 4, 2025 general-election ballot or, alternatively, a writ of mandamus to compel the board of elections to sustain M/I Homes' protest against the referendum petition. We deny the writs. Also pending is M/I Homes' motion for leave to file amended evidence, which we grant.

## I. BACKGROUND

{¶ 2} M/I Homes is under contract to purchase 119.91 acres of property for the purpose of creating a residential development called Farmstead, consisting of 239 proposed dwellings. The property is made up of three parcels of land. Two of the parcels are currently zoned A, agricultural district, and the third is zoned E-R, estate-residential district.

{¶ 3} On February 20, 2025, M/I Homes filed an application with the Batavia Township Zoning Commission requesting approval to rezone to PD, planned-development district, the entirety of the parcel zoned estate residential and portions of the other two parcels zoned agricultural. The zoning commission did not approve the application, and the matter then proceeded before the Batavia Township Board of Trustees. After holding a public hearing on the matter, the board of trustees voted three to zero to approve the rezoning request on April 7. The trustees memorialized their approval by letter to MI/Homes and the property owner, specifying that the hearing had been held to consider the following:

> [A] proposal to rezone a parcel from the "A" Agricultural and "ER" Estate Residential Districts to the "PD" Planned Development District. The portion of parcels under consideration includes three PINs: 032019D195, 012020B032, and 032019D225, totaling 119.91 (+/-) acres. The property is located at 3648 SR 222, Batavia, OH 45103, at the northeast corner of SR 222 and Chapel Road in Batavia Township.

{¶ 4} The letter went on to specify 11 conditions of approval. To paraphrase, the conditions concern: (1) the rezoning request's fit with Batavia Township's 2018 growth-policy plan; (2) dedication of a right-of-way; (3) details of the proposed mounding and buffering, entry monuments and signs, pergolas, and seating areas; (4) storm-water management; (5) community amenities (e.g., a clubhouse, community pool, and playground); (6) bike racks; (7) homeowner-association documents; (8) construction materials; (9) landscaping; (10) a traffic study; and (11) perimeter buffer yards and landscaping.

{¶ 5} Following the trustees' vote approving the rezoning application, opponents of the trustees' decision, consisting partly of adjoining landowners, obtained elector signatures on a petition for the purpose of placing a referendum on the November 4, 2025 general-election ballot, and they filed the petition with the board of trustees. *See* R.C. 519.12(H) (authorizing a referendum petition to allow a ballot measure for electors to approve or reject a board of township trustees' adoption of a proposed zoning amendment that must be filed with the board of township trustees). For their referendum petition, the opponents used Form No. 6-O, a form prescribed by the secretary of state. In the space provided beneath a line on the form that calls for a "brief summary of the proposed zoning amendment," the opponents wrote the following:

3

Zoning Case B-03-25ZPD (Farmstead) requesting to amend the zoning designation of parcels (PINs 012020B032, 032019D195, and 032019D225) consisting of +/- 119.91 acres from the "A" Agricultural and "E-R" Estate Residential Zoning Districts to "PD" Planned Development District for the purposes of developing 169 detached single family homes and 70 attached two-family dwellings. The property is located at 3648 State Route 222 at the north-eastern corner of State Route 222 and Chapel Road.

{¶ 6} The board of trustees certified the referendum petition to the board of elections. *See* R.C. 519.12(H) ("the board of township trustees shall certify the petition to the board of elections" and "[t]he board of elections shall determine the sufficiency and validity of each petition certified to it by [the] trustees"). M/I Homes then filed a protest against the petition with the board of elections. *See* R.C. 3501.39(A) (authorizing petition protests). Following a hearing on the matter, the board of elections voted to deny the protest on August 18, 2025.

{¶ 7} M/I Homes filed this original action two days later, asking for a writ of prohibition to prohibit the board of elections from placing the referendum on the general-election ballot or, alternatively, a writ of mandamus to compel the board of elections to sustain M/I Homes' protest against the referendum petition. The case was automatically expedited under S.Ct.Prac.R. 12.08. While the case was pending, M/I Homes filed a motion for leave to file amended evidence.

## II. ANALYSIS

### A. Motion for leave to file amended evidence

{¶ 8} M/I Homes requests leave to file amended evidence on the ground that when it originally submitted its evidence, it did so with incorrect exhibit

lettering. M/I Homes thus seeks to correct the alphabetic identification of its previously filed exhibits and evidence. We grant the motion.

### B. Prohibition

{¶ 9} To be entitled to a writ of prohibition, M/I Homes must prove by clear and convincing evidence that (1) the board of elections has exercised quasi-judicial power, (2) the exercise of that power is unauthorized by law, and (3) denying the writ would result in injury for which no adequate remedy exists in the ordinary course of the law. *State ex rel. Schreiner v. Erie Cty. Bd. of Elections*, 2024-Ohio-290, ¶ 6. The first and third elements are met. As to the first element, R.C. 3501.39(A) required the board of elections to conduct a quasi-judicial hearing on M/I Homes' petition protest. *See State ex rel. Barney v. Union Cty. Bd. of Elections*, 2019-Ohio-4277, ¶ 12. As to the third element, M/I Homes lacks an adequate remedy in the ordinary course of the law due to the proximity of the upcoming election. *See id.*

{¶ 10} What remains to be decided is whether the board of elections' exercise of power was unauthorized. In answering this question, we ask whether the "board acted fraudulently or corruptly, abused its discretion, or clearly disregarded applicable law." *State ex rel. Brown v. Butler Cty. Bd. of Elections*, 2006-Ohio-1292, ¶ 23. The focus here is on whether the board of elections abused its discretion or clearly disregarded applicable law.

{¶ 11} M/I Homes advances two main arguments in support of its challenge to the board of elections' denial of its protest. The first argument, which M/I Homes subdivides into two subarguments, relates to the referendum petition's brief summary of the zoning amendment. The second argument relates to a map that one of the petition's circulators created. Each argument is addressed in turn.

### 1. Brief summary

{¶ 12} Under R.C. 519.12(H), a referendum petition must "contain . . . a brief summary of [the proposed zoning amendment's] contents." This court has

construed this clause to require a brief summary of "the contents of the zoning amendment passed by the township trustees." *State ex rel. Donaldson v. Delaware Cty. Bd. of Elections*, 2021-Ohio-2943, ¶ 13. "The purpose of requiring a summary is 'to present fairly and accurately the question or issue to be decided in order to assure a free, intelligent and informed decision by the persons to whom it is presented.'" *State ex rel. Hamilton v. Clinton Cty. Bd. of Elections*, 67 Ohio St.3d 556, 559 (1993), quoting *Nunneker v. Murdock*, 9 Ohio App.3d 73, 77 (1st Dist. 1983). "If a summary is misleading, inaccurate, or contains material omissions that would confuse the average person, the petition is invalid and the referendum may not be submitted for a vote." *State ex rel. Thomas v. Wood Cty. Bd. of Elections*, 2024-Ohio-379, ¶ 36. At a minimum, a summary "must (1) identify the location of the relevant property and (2) inform the reader of the present zoning status of the land and the precise nature of the requested change." *Id.* at ¶ 38; *see also Donaldson* at ¶ 14-16.

### a. *The brief summary's description of the breadth of the zoning change*

{¶ 13} M/I Homes argues that the referendum petition's brief summary is misleading and inaccurate because it falsely states that three parcels are being "completely" rezoned when in fact they are not. Recall that two of the three parcels at issue have not been designated to be rezoned entirely from agricultural to the planned-development classification. Rather, *portions* of these two parcels have been so designated. The petition's summary fails to explicitly make this point. Instead, the summary says that there has been a request to "amend the zoning designation of parcels (PINs 012020B032, 032019D195, and 032019D225) consisting of +/- 119.91 acres from the 'A' Agricultural and 'E-R' Estate Residential Zoning Districts to 'PD' Planned Development District . . . ." M/I Homes argues that "the [p]etition grossly overstates the amount of land that is being rezoned 'PD.'" It claims that failing to explain that portions of two parcels will remain zoned agricultural is "significant" because those portions will "help[] the

entire area retain its semi-rural, quiet, and agricultural aura." In M/I Homes' view, this lack of specificity "renders the [p]etition materially false and misleading," and thus, invalid.

{¶ 14} To begin, M/I Homes is wrong to claim that the referendum petition's brief summary states that all three parcels are being "completely" rezoned. The petition does not use that word. Rather, it is an inference drawn by M/I Homes, and nothing in this court's caselaw requires that a petition's summary be read in its most extreme sense. What M/I Homes glosses over is the fact that the petition accurately states that +/- 119.91 acres set across the three affected parcels have been designated for a zoning change. In other words, were the *average person* to read the summary, he or she could not help but understand that the proposal to be voted on would affect the zoning status of roughly 120 acres of property spanning three parcels of land. *See Thomas* at ¶ 36 (a referendum petition's brief summary must be understood according to how the "average person" would understand it); *see also State ex rel. Shamro v. Delaware Cty. Bd. of Elections*, 2025-Ohio-941, ¶ 15.

{¶ 15} To be sure, the opponents could have improved on the language they used by specifying the exact portions of the parcels that have been designated for a zoning change. But any potential confusion caused by this omission is offset by the fact that the brief summary accurately states the affected acreage. *See State ex rel. C.V. Perry & Co. v. Licking Cty. Bd. of Elections*, 2002-Ohio-1369, ¶ 18 (even if language in a referendum petition's brief summary could be improved, the language is valid if it does not mislead, is accurate, and does not contain material omissions). And M/I Homes does not dispute that the summary accurately identifies the location of the affected acreage.

{¶ 16} M/I Homes cites this court's decision in *Markus v. Trumbull Cty. Bd. of Elections*, 22 Ohio St.2d 197 (1970), and the First District Court of Appeals' decision in *State ex rel. Tiettmeyer v. Eyrich*, 1985 WL 9318 (1st Dist. Feb. 6,

1985), in its merit brief, but these cases do little to advance its position. Unlike this case, in *Markus*, the petition language quoted in the court's opinion did not explicitly refer to the amount of acreage that would be affected, *Markus* at 200-201. Moreover, the referendum petition failed to accurately state the present zoning status of the property at issue. The referendum advocates in that case stated that the zoning amendment was for a change from residential use to commercial and business use, without disclosing that part of the property was already zoned for commercial and business use. *Id.* at 200. Here, however, there is no question that the brief summary of the zoning amendment accurately describes the present zoning status of the three affected parcels.

{¶ 17} In *Tiettmeyer*, the appellate court faulted the referendum's petition's brief summary for failing to "indicat[e] that the specific zoning change and the accompanying development of the site would be limited to an area approximately half the size of the entire twenty-five-acre parcel." *Tiettmeyer* at *4. But that case is distinguishable because the petition summary at issue in *Tiettmeyer* did not describe the acreage of the parcel *at all*, let alone specify which portion of the parcel would be affected. Thus, the average person would have had no sense of the breadth of the proposed development. *See id*. Here, in contrast, the petition's summary accurately describes the affected acreage.

{¶ 18} Although the board of elections does not argue the point, M/I Homes further errs by overlooking the fact that not even the board of trustees was able to achieve the level of drafting accuracy that it claims the opponents had to meet here. As this court has stated, an alleged defect with a referendum petition's brief summary must be understood within its context. *See State ex rel. Jacquemin v. Union Cty. Bd. of Elections*, 2016-Ohio-5880, ¶ 11 ("as is so often the case, the context of the [summary's] mistake informs its import"). The context here shows that in successive sentences of the first paragraph of the trustees' letter memorializing its approval of the rezoning proposal, the trustees characterized the

zoning changes differently. The second sentence states that the purpose of the proposal is to "rezone *a parcel* from the 'A' Agricultural and 'ER' Estate Residential Districts to the 'PD' Planned Development District." (Emphasis added.) The use of the phrase "a parcel" incorrectly suggests that only one parcel is at issue. Continuing, the third sentence states that the "portion of parcels under consideration includes three PINs: 032019D195, 012020B032, and 032019D225, totaling 119.91 (+/-) acres." This sentence at least uses the word "portion," but even that qualifier is imprecise because the trustees did not specify which parcels the qualifier pertained to. Moreover, the trustees' use of the word "includes" arguably suggests that more than three parcels are at issue. *See, e.g.*, *Gilman v. Hamilton Cty. Bd. of Revision*, 2010-Ohio-4992, ¶ 15 (when used in a statute, the word "includes" signals that a list is not meant to be exhaustive).

{¶ 19} In our view, the board of trustees' inexactitude in describing the scope of the zoning changes cuts against finding any fault in the referendum petition for failing to achieve absolute precision in the brief summary. Instructive on this point is *State ex rel. Quinn v. Delaware Cty. Bd. of Elections*, 2018-Ohio-966, in which this court considered whether a referendum petition was invalid because the brief summary failed to specify that the title of a zoning application pertained to the application's revised version. This court declined to hold that the petition was deficient for failing to identify the correct title, noting that the township zoning commission had referred inconsistently to the application's title and that the local trustees had altogether failed to refer to the application in its revised form. *Id.* at ¶ 30-32. We explained that "it would unjustly interfere with the right of referendum to require [the person who submitted the petition] to strictly adhere to a convention that the zoning board and the trustees did not themselves follow." *Id.* at ¶ 32. By similar logic, here, it would unjustly frustrate the opponents' right of referendum to require them to achieve a level of drafting perfection that the trustees could not achieve.

### b. The brief summary's description of the nature of the zoning change

{¶ 20} M/I Homes next argues that the referendum petition's brief summary is defective because it is "materially misleading" by way of omission of material information. In its view, the summary conveys that "pastoral farmland is going to be converted into a highly dense development of identical, mass-produced, low-cost houses crammed into too little space." The summary does this, M/I Homes says, by "simply stat[ing] zoning designations—without explanation—and that the developer wishes to build over 200 homes." M/I Homes further asserts that the summary omits a laundry list of positive features associated with the development. To paraphrase, the omitted features that it views as material are the following aspects that are anticipated in the proposed development: more than 41 acres of green space; amenities such as a pool, clubhouse, bike rack, and playground; a homeowners' association; limitations on construction materials; landscaping and mounding requirements; natural tree buffers; phased construction; a net density of 2.08 dwelling units per acre; and cession of nearly 15 acres to the township for right-of-ways. M/I Homes adds that it reduced the number of lots in the development based on community input that portions of the two parcels currently zoned agricultural will retain their agricultural-zoning designation.

{¶ 21} The referendum petition's brief summary in this case accurately states the rezoning designation—that is, it accurately states that the affected acreage will be rezoned to "PD" and clarifies that the acronym stands for "Planned Development District." M/I Homes views this language as inadequate, but it suffices under this court's precedent. *See C.V. Perry & Co.*, 2002-Ohio-1369, at ¶ 17 ("The summary informs electors of the precise nature of the zoning change, *i.e.*, from the 'AG' classification to the 'PUD' classification."). So too, the summary accurately states the number of homes proposed for development, and M/I Homes fails to cite any authority that requires a court to cast suspicion on a petition summary that accurately describes the number of homes proposed for

residential development. What is more, the law does not require a petition summary to describe a zoning proposal's evolution based on community input. *See State ex rel. Hillside Creek Farms, L.L.C. v. Clark Cty. Bd. of Elections*, 2021-Ohio-3214, ¶ 34. To prevail, then, M/I Homes must show that notwithstanding the fact that the petition accurately states the zoning change associated with the affected acreage and accurately states the nature and number of homes proposed for development, the petition remains defective because its summary does not (1) enumerate the features outlined above that M/I Homes views as material or (2) specify that portions of two parcels will remain classified as agricultural.

{¶ 22} We have already disposed of M/I Homes' portion-related argument. So, M/I Homes must show that the brief summary is defective because it does not enumerate the features cited above that M/I Homes views as material.

{¶ 23} Because M/I Homes' argument implicates the meaning of a legislative enactment, our analysis must begin with the text. *See Slingluff v. Weaver*, 66 Ohio St. 621 (1902), paragraph two of the syllabus (when interpreting a statute, we do not ask "what did the general assembly intend to enact, but what is the meaning of that which it did enact"). This court has observed that the term "brief summary" in R.C. 519.12(H) "'connote[s] brevity rather than comprehensiveness.'" *C.V. Perry & Co.* at ¶ 17, quoting *Rose v. Montgomery Cty. Bd. of Elections*, 1995 WL 558820, *2 (2d Dist. Sept. 22, 1995). But by prioritizing the converse, which would require an enumeration of roughly a dozen features associated with the development, M/I Homes invites this court to assign a meaning to the text that it cannot fairly bear. *See Great Lakes Bar Control, Inc. v. Testa*, 2018-Ohio-5207, ¶ 9 (addressing the fair-reading method of a text by explaining that "we consider the ordinary meaning of the word as it is used within the surrounding text"), citing Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 56, 356 (2012). Had the General Assembly intended referendum advocates to provide in their summary the type of expansive description that M/I

Homes urges here, "it would not have been difficult [for the General Assembly] to use wording to that effect," *State ex rel. Xenia v. Greene Cty. Bd. of Commrs.*, 2020-Ohio-3423, ¶ 12.

{¶ 24} Without a strong foothold in the statutory text, M/I Homes turns to the caselaw, but the decisions it relies on are unpersuasive. In *E. Ohio Gas Co. v. Wood Cty. Bd. of Elections*, 1998-Ohio-285, which M/I Homes regards as "control[ling]," the rezoning proponent had submitted an application to the local trustees to rezone its property from the agricultural classification to the industrial-district classification but later withdrew the application due to concerns of the trustees and local citizens that the industrial development would lack sufficient oversight by the township. The proponent then submitted an application seeking to have the property rezoned to the planned-industrial-district classification. In doing so, the proponent stated that its reason for seeking the amendment was to "'to make the land available for development as industrial property *in conformance with the requirements of the PI-Planned Industrial District . . . by providing a planned area for industrial growth . . . .*'" (Emphasis and ellipses in *E. Ohio Gas*.) *Id.* at ¶ 13. In the referendum petition's brief summary opposing the proponent's request, the referendum advocates accurately stated that the property would be rezoned to the planned-industrial-district classification, but they went on to state that the proponent's reason for seeking the designation change was to "make the land available for development as industrial property . . . ."—the advocates used an ellipsis after the word "property" instead of including the remainder of the proponent's reasons for its application. *Id.* at ¶ 5. This court concluded that the summary's omission of the emphasized portion of the proponent's stated reasons for seeking the zoning change conveyed the wrong impression that the change would be to the general-industrial-district classification rather than the planned-industrial-district classification. *Id.* at ¶ 13-14.

{¶ 25} This case is different. Unlike in *E. Ohio Gas*, there is no evidence establishing that M/I Homes ever submitted an application seeking to have the property rezoned to anything other than the classification that is stated on the referendum petition's brief summary, namely, the planned-development-district classification. Accordingly, there is no basis for concluding that the average person could be misled into thinking that the affected property could be rezoned according to anything other than the planned-development-district classification that is stated in the summary.

{¶ 26} M/I Homes next cites *State ex rel. McCord v. Delaware Cty. Bd. of Elections*, 2005-Ohio-4758. There, the local trustees adopted a resolution approving a rezoning proponent's application, but the resolution was defeated by referendum. *Id.* at ¶ 2-5. The proponent then filed a new application, and the local trustees adopted a new resolution approving the new application. *Id.* at ¶ 6, 9. The referendum advocates who were opposed to the new resolution identified in their petition summary the land uses contained in the prior summary of the defeated resolution without including new uses approved by the new resolution. *Id.* at ¶ 55. This court held that the summary was defective because it "conveyed the false impression" that the new resolution was the same as the old resolution. *Id. McCord* is of no help to M/I Homes, however, because the evidence in this case does not disclose that M/I Homes' development proposal at issue here previously existed in a different form that was already defeated by referendum.

{¶ 27} M/I Homes next draws our attention to *Shelly & Sands, Inc. v. Franklin Cty. Bd. of Elections*, 12 Ohio St.3d 140 (1984). The distinctive context of that case involved Shelly & Sands' ownership of a large tract of land on which it had conducted quarrying operations for many years and its request for a zoning amendment applicable to a very minor portion of the tract on which it wanted to operate an asphaltic batch plant. *Id.* at 140. The referendum question concerned only whether Shelly & Sands would be permitted to operate the asphaltic batch

plant on the minor portion of the tract. *Id.* at 142. That is, no matter the referendum's results, the minor portion of the tract could still be used in quarrying. *Id.* The petition's summary stated that the zoning change pertained to the "'use in the production of asphaltic concrete and *a continuation of sand and gravel quarry operation*.'" (Emphasis added.) *Id.* This court held that by adding the italicized language, the referendum advocates conveyed the mistaken impression that the voters could shut down altogether Shelly & Sands' right to continue its sand-and-gravel quarrying operation. *Id.*

{¶ 28} According to M/I Homes, this case presents an "identical" problem to *Shelly & Sands* because, it says, the referendum petition's brief summary conveys the misleading impression that if the referendum were to prevail, it would stop all development on the property. In support, M/I Homes observes that under the property's current zoning designation, it is permissible to construct single-family homes at specified densities. Unlike in *Shelly & Sands*, however, the petition summary here does not speak in terms of a continuation of preexisting uses on the affected property. As a further point in contrast, the voters could not be misled into thinking that they could shut down M/I Homes' current operations on the property, because there is no evidence establishing that M/I Homes is presently engaged in any operations whatsoever on the property.

{¶ 29} Last is *Donaldson*, 2021-Ohio-2943, which M/I Homes cites in its reply brief. *Donaldson* involved a referendum petition's brief summary that gave almost no sense of what the zoning amendment would permit. *See id.* at ¶ 15 (quoting the petition summary's statement that the zoning amendment would "'include sections detailing . . . permitted uses, open space and prohibited uses'" [ellipsis in *Donaldson*]). The petition summary here, in contrast, is more specific, referring to the development of one and two-family homes. Moreover, although *Donaldson* assigns importance to the need to describe a property's "current use" in a petition summary, *id.*, this court clarified in *Thomas*, 2024-Ohio-379, at ¶ 41, that

if "the zoning amendment adopted by the trustees did not describe the current use of the property," then the petition summary need not do so either. M/I Homes fails to explain where in the trustees' letter memorializing their approval of the zoning change that they referred to a current use of the property.

{¶ 30} In sum, it seems that the worst that can be said about the opponents' referendum petition's brief summary is that by failing to enumerate the dozen or so features associated with the proposed development, the opponents did not make the summary comprehensive enough. But comprehensiveness is not the measure of a referendum petition's validity. *See C.V. Perry & Co.*, 2002-Ohio-1369, at ¶ 17. And M/I Homes has not otherwise shown under the caselaw that the omitted features constituted material information that was necessary to enable the voters to form a "free, intelligent and informed decision" on the referendum question. *Hamilton*, 67 Ohio St.3d at 559. It is true that in *Shamro*, 2025-Ohio-941, at ¶ 16, 19, this court held that a board of elections did not abuse its discretion or act in clear disregard of applicable law when it determined that a petition's summary was misleading because it did not mention four approved modifications to the zoning amendment. But *Shamro* hardly stands for the converse proposition that a board of elections *always* abuses its discretion or clearly disregards applicable law when it denies a protest that involves a petition summary that does not mention every feature or condition of a zoning amendment.

### 2. Appropriate map

{¶ 31} R.C. 519.12(H) provides that a referendum petition that is filed with a board of township trustees must "be accompanied by an appropriate map of the area affected by the zoning proposal."

{¶ 32} At the outset, when M/I Homes filed its merit brief, it stated that the opponents had filed one map with the trustees, which we will call the "first map," and that a petition circulator for the opponents had created another map, which we will call the "second map," for use in obtaining signatures that the opponents did

*not* file with the board of trustees.  When the board of elections filed its merit brief, however, it stated that both the first map and the second map had been filed with the board of trustees, pointing to a statement from a board of elections' employee at the protest hearing that "[t]hese two [maps] were submitted."  M/I Homes acknowledges the employee's statement but seems to suggest that some greater increment of evidence is needed to verify that the second map was filed with the board of trustees.  But M/I Homes cites no authority that would require this court to discount the employee's statement.

{¶ 33} The petition circulator who created the second map testified at the protest hearing that he had created the second map from M/I Homes' site plan.  In creating this second map, the petition circulator enlarged the depiction of the site plan because he found it hard to see.  To the far-right side, he added three comment boxes containing certain information that he thought a potential petition signer would find "informative."  Two of the comment boxes specify the number, acreage, and a "between" distance of the proposed dwellings.  The third box says, "~500+ cars on SR222," which the petition circulator testified provides an estimate of the uptick in vehicle traffic that would be caused by the development.  Last, the petition circulator  enlarged an architect's rendering of an aerial view of what M/I Homes refers to as a "paired villa" dwelling, and he added an image of that rendering to the right side of the second map.

{¶ 34} M/I Homes' attacks the second map in multiple ways.  First, it argues that the second map was not filed with the board of trustees.  However, in view of the statement by the board of elections' employee at the protest hearing, that argument fails.  But even if the second map had not been filed with the trustees, M/I Homes' argument would still fail.  The relevant clause of R.C. 519.12(H) is written in the singular, not the plural, and it requires the filing of "*an* appropriate map."  (Emphasis added.)  Because nothing in the statutory language requires the

filing of more than one map, the opponents did all that they needed to do under the statute by filing the first map.

{¶ 35} Second, M/I Homes argues that the second map's comment boxes misrepresent the character of the development. It further asserts that the enlargement of the architect's rendering on the second map obscures several of the development's alleged positive elements reflected in the notes section of the first map (e.g., a prohibition on overhead utilities) and that the enlarged rendering also covers up a smaller "vicinity" map and other site-specific information (e.g., survey details). In M/I Homes' view, anyone who viewed the second map would have been misled about the character of the development. This argument is unpersuasive. "A map accompanying a referendum petition should be considered appropriate or suitable for purposes of R.C. 519.12(H) if it does not mislead the average person about the *area* affected by the zoning resolution." (Emphasis added.) *McCord*, 2005-Ohio-4758, at ¶ 63. Dispositive here is that M/I Homes does not argue that the area depicted on the second map is wrong, say, by depicting only a portion of the affected acreage or by depicting the affected acreage in the wrong location. While it is true that the second map covers up an inset "vicinity" map, the second map nevertheless displays a larger and more detailed map of the affected area—as compared to the inset vicinity map—on the left side of the document.

{¶ 36} Third, M/I Homes attacks the propriety of the first map by invoking the features of the second map. M/I Homes points to the petition circulator's statement that he created the second map because he believed more information was needed concerning M/I Homes' proposed development. According to M/I Homes, the existence of this second map constitutes a concession by the opponents that the first map was "insufficient for its purpose." In support, M/I Homes points to some general statements of law contained in *McCord* at ¶ 63 and *Markus*, 22

Ohio St.2d at 203, but nothing in either of the statements that M/I Homes quotes stands for the proposition that it advances here.

{¶ 37} Fourth, M/I Homes argues in its reply brief that the second map should not be evaluated under the standards for determining the appropriateness of a map but should instead be viewed as "*part of the petition*" itself. (Emphasis in original.) M/I Homes claims that it is able to make this argument in its reply brief because of what it calls a "concession" by the board of elections in the board's merit brief, wherein the board stated that the second map was filed with the trustees. In M/I Homes' view, that alleged concession "revolutionize[d]" its case.

{¶ 38} Even if the board of elections did open the door to the argument that M/I Homes raises in its reply brief, the authority that M/I Homes cites does not require this court to treat the second map in this case as constituting a *part* of the petition rather than a standalone map. In *Barney*, 2019-Ohio-4277, at ¶ 6, unlike here, the brief summary at issue referred to the existence of a map as an "attached exhibit[]." In *State ex rel. T-Bill Dev. Co., L.L.C. v. Union Cty. Bd. of Elections*, 2021-Ohio-3535, ¶ 22-24, the proponents of a zoning amendment argued that the maps attached to the referendum advocates' petition were misleading because they were faded and blurry. Although M/I Homes makes a faded-and-blurry argument here, it does so for the first time in its reply brief. Moreover, it does so in attacking the *first* map. M/I Homes has forfeited its faded-and-blurry argument by failing to raise it in its merit brief. *See Pi In The Sky, L.L.C. v. Testa*, 2018-Ohio-4812, ¶ 5, fn. 1. Last, M/I Homes invokes *State ex rel. Pinkston v. Delaware Cty. Bd. of Elections*, 2023-Ohio-1060, but that decision did not command a majority vote and thus articulates no binding rule of law to apply here.

{¶ 39} In sum, we deny the writ of prohibition because M/I Homes has not shown that the board of elections abused its discretion or clearly disregarded applicable law.

### C. Mandamus

**{¶ 40}** To be entitled to a writ of mandamus, M/I Homes must prove by clear and convincing evidence "(1) a clear legal right to the requested relief, (2) a clear legal duty on the part of the board of elections to provide it, and (3) the lack of an adequate remedy in the ordinary course of the law." *Shamro*, 2025-Ohio-941, at ¶ 12. Because we are denying the writ of prohibition in this case, and because M/I Homes treats the mandamus analysis as duplicative of the prohibition analysis, we deny the writ of mandamus. *See State ex rel. Moscow v. Clermont Cty. Bd. of Elections*, 2022-Ohio-3138, ¶ 25 (observing that the "mandamus analysis [was] identical to the prohibition analysis" in a case in which a board of elections had denied a protest brought against a ballot measure).

### III. CONCLUSION

**{¶ 41}** The writ of prohibition is denied, the writ of mandamus is denied, and M/I Homes' motion for leave to filed amended evidence is granted.

Writs denied.

————————————

Keating Muething & Klekamp, P.L.L., Thomas M. Tepe Jr., Taylor V. Trout, Collin L. Ryan, and Samuel B. Weaver, for relator.

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Brian C. Shrive and Julia B. Carney, Assistant Prosecuting Attorneys, for respondent.

————————————